IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| LASHONDRA DAVIS, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Civil Action No. 3:15-CV-01654-N |
| | § | |
| AETNA LIFE INSURANCE CO., | § | |
| | § | |
| Defendant. | § | |

# ORDER

This Order addresses Plaintiff LaShondra Davis's motion for summary judgment [14], and Defendant Aetna Life Insurance Co.'s ("Aetna") motion for summary judgment [19]. Because Aetna did not abuse its discretion in denying Davis benefits, the Court grants Aetna's motion and denies Davis's motion.

## I. DAVIS'S CLAIM FOR DISABILITY BENEFITS

This case arises from Aetna's adjustment of Davis's claim for long-term disability benefits. Davis, a customer support associate at Experian Information Systems, Inc. ("Experian"), was a participant in the Experian Long-Term Disability Plan (the "Plan"). *See* Pl.'s Original Compl. ¶¶ 47, 50–51 [1]. On April 21, 2010, Davis ceased working full-time at Experian. Pl.'s App., Ex. A at 0560 [16] (hereafter "App."). Davis's rheumatologist, Don E. Cheatum, M.D., diagnosed her with lupus, proteinuria, fatigue, and morning stiffness. *Id.* at 0560. Davis subsequently applied for short-term disability ("STD") and long-term disability ("LTD") benefits under the Plan.

ORDER – PAGE 1

### *A. Aetna Initially Approves Davis's Claim for STD and LTD Benefits*

Aetna, the Plan's underwriter and claims administrator, certified STD benefits to Davis based on Dr. Cheatum's diagnosis. *Id.* at 0123, 0583. To determine Davis's continued eligibility for STD benefits, Aetna requested a physician peer review from Anne M. MacGuire, M.D., who reviewed Davis's records and engaged in a peer-to-peer conversation with Dr. Cheatum. *Id.* at 0585–86. Dr. MacGuire opined that Davis suffered significant physical and mental impairments during the STD benefit period. *Id.* at 0587. Accordingly, Aetna paid Davis 26 weeks of STD benefits. *Id.* at 0590.

Aetna later reviewed Davis's claim for LTD benefits and advised her that she was eligible for the first 24 months of LTD benefits beginning October 20, 2010. *Id.* at 0592, 0634. An Administrative Law Judge, however, determined that Davis did not qualify for Social Security Disability Income during the same 24-month period. *Id.* at 0727.

### *B. Aetna Reviews Davis's Claim for LTD Benefits*

After the first 24 months of LTD benefits, the Plan provided for payment only if Davis was "not able, solely because of injury or disease, to work at any reasonable occupation." *Id.* at 0097. The Plan gave Aetna "the discretionary authority to determine whether and to what extent employees and beneficiaries are entitled to benefits and construe any disputed or doubtful terms of this policy." *Id.* at 0093. The initial 24-month period for Davis's LTD benefits ended on October 20, 2012. *Id.* at 0634.

Aetna subsequently began an inquiry to determine whether Davis was eligible for continued LTD benefits under the "any reasonable occupation" standard. A nurse performed

a clinical review of Davis's claim and concluded that the documentation regarding her functional impairment was inconsistent. *Id.* at 0315. The nurse recommended that Davis undergo an Independent Medical Examination ("IME"). *Id.* Charles R. Crane, M.D., conducted the IME. *Id.* at 819. Dr. Crane concluded that Davis "is able to do sedentary and light type activities for brief periods of time, but due to the fatigue associated with her underlying lupus and rheumatoid arthritis, cannot maintain prolonged periods of active competitive work without having to take a break for rest and recovery." *Id.* at 821. Dr. Crane also noted that Davis's lupus periodically flares up, "which results in increased periods of pain, joint swelling, and joint pain." *Id.* at 821–22. Based on this report, Aetna approved Davis's LTD benefits under the "any reasonable occupation" standard. *Id.* at 0825.

      Aetna continued to monitor Davis's condition. Dr. Cheatum sent medical records to Aetna documenting Davis's symptoms of morning stiffness, chronic pain, severe fatigue, and short term memory loss. *Id.* at 0876–900. Although Davis and Dr. Cheatum informed Aetna that she had also sought treatment from a nephrologist, a family practitioner, and a cardiologist, *see id.* at 0718, 0880, Aetna did not request medical records from these doctors. Another nurse performed a clinical review of Davis's claim and found inconsistent or insufficient documentation of her functional impairment. *Id.* at 0330. Two claims examiners conducted telephone interviews with Davis regarding her medical condition and daily activities. *Id.* at 0325, 0366–68. Davis reported that she did not drive and continued to suffer from severe fatigue, stiffness, and joint pain. *Id.*

Aetna obtained video surveillance of Davis's activities on three dates. *Id.* at 0962. Aetna also conducted a public records search of Davis and reviewed her husband's social media. *Id.* at 0956–0966. The parties dispute the results and probative value of the video surveillance and public records search. However, at the very least, the video surveillance shows Davis driving, running errands, and walking without the use of any assistive devices. *Id.* at 0962–63. Davis's LinkedIn account indicated she was a student at Northcentral University. *Id.* at 0964. Her husband's Facebook account also indicated that Davis had visited several restaurants, a movie theater, and numerous sites in San Antonio, including the Alamo Mission, SeaWorld, and Aquatica, over the last two years. *Id.* at 0964–68.

Aetna asked Joseph L. Braun, M.D., an occupational medicine specialist, to perform a peer review. *Id.* at 0976. The parties dispute whether Dr. Braun reviewed all of the relevant medical evidence before reaching his conclusions. Dr. Braun did engage in a peer-to-peer conversation with Dr. Cheatum regarding Davis's medical condition. *Id.* at 0978. Ultimately, Dr. Braun determined that "the evidence presented does not support any level of restriction/limitation in impairment." *Id.* at 0979. Dr. Braun opined that Davis could perform sedentary work and "may be capable of functionality higher than this." *Id.* Aetna forwarded Dr. Braun's peer review to Dr. Cheatum and Davis for review and comment, but they did not respond. *Id.* at 0983.

On March 27, 2014, Aetna informed Davis that she no longer qualified for LTD benefits. *Id.* at 0986. Aetna based its determination on Dr. Cheatum's medical records, the IME, Dr. Braun's peer review assessment, the public records and social media search, the

video surveillance, and Davis's telephone conversations with her disability coordinator. *Id.* 0987. Aetna found the clinical evidence did not demonstrate that Davis suffered from any physical or cognitive impairment "that would preclude [her] from sitting up to 8 hours a day, with the ability to change positions as necessary and lifting up to ten pounds occasionally." *Id.* Aetna noted that this description was consistent with the requirements of Davis's previous job as a customer support associate at Experian. *Id.*

### C. Davis Appeals Aetna's Termination of LTD Benefits

Davis appealed Aetna's decision to terminate her benefits. *Id.* 0992. Dr. Cheatum sent Aetna additional medical records. *Id.* at 1009–20. Aetna also asked Siva Ayyar, M.D., to conduct a peer review. *Id.* at 1309. Dr. Ayyar attempted to conduct a peer-to-peer conference with Dr. Cheatum but was unable to reach him. *Id.* at 1208. After reviewing Davis's medical records and the video surveillance, Dr. Ayyar concluded:

> The claimant does not have any reproducible neurologic, serologic, hematologic, rheumatologic, or musculoskeletal impairments which would give rise to the imposition of any limitations or restrictions here, let alone the proclamation of total inability to work set forth by Dr. Cheatum. The claimant's behavior on surveillance seemingly suggests that she exhibits and retains well-preserved ability, capability and functionality well in excess of her stated capacity and well in excess of her proclamation of inability to work from a medical perspective.

*Id.* at 1209. Upon Aetna's request for comment, Dr. Cheatum provided a progress note regarding Davis's condition. *Id.* at 1213.

Dr. Ayyar conducted a second peer review based on Dr. Cheatum's progress note. *Id.* at 1238–39. Dr. Ayyar once again attempted to conduct a peer-to-peer consult with Dr.

Cheatum, but was unsuccessful. *Id.* at 1239–40. Dr. Ayyar's second peer review did not endorse any biomechanical limitations or restrictions. *Id.* at 1241.

Aetna asked Dr. Ayyar to conduct a third peer review. *Id.* at 1245. This time, Dr. Ayyar successfully made contact with Dr. Cheatum and discussed Davis's medical condition. *Id.* at 1246. In his report, Dr. Ayyar concluded, "[i]f and when the claimant has temporary flares of pain, swelling and/or synovitis associated with systemic lupus erythematosus, the claimant may require temporary limitations and/or restrictions at those points in time. There is, however, no factual support for the imposition of any continuous limitations or restrictions . . . ." *Id.*

After reviewing Davis's file, Aetna upheld its prior decision to terminate Davis's LTD benefits. *Id.* at 1282. Aetna found that although Davis carried a diagnosis of systemic lupus erythematosus, her medical condition did not require the imposition of continuous physical limitations or restrictions. *Id.* at 1283–84.

Davis now contends that Aetna's adjustment of her claim violated the Employee Retirement Income Security Act of 1974 ("ERISA"). Davis asserts that Aetna breached the Plan in violation of 29 U.S.C. § 1132(a)(1)(B) by denying her LTD benefits. Davis seeks an award of attorney's fees under 29 U.S.C. § 1132(g)(1). Both parties have moved for summary judgment pursuant to Federal Rule of Civil Procedure 56.

## II. THE SUMMARY JUDGMENT STANDARD

Courts "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."

FED. R. CIV. P. 56(a); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986). In making this determination, courts must view all evidence and draw all reasonable inferences in the light most favorable to the party opposing the motion. *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962). The moving party bears the initial burden of informing the court of the basis for its belief that there is no genuine issue for trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

When a party bears the burden of proof on an issue, "he must establish beyond peradventure all of the essential elements of the claim or defense to warrant judgment in his favor." *Fontenot v. Upjohn Co.*, 780 F.2d 1190, 1194 (5th Cir. 1986). When the nonmovant bears the burden of proof, the movant may demonstrate entitlement to summary judgment either by (1) submitting evidence that negates the existence of an essential element of the nonmovant's claim or affirmative defense, or (2) arguing that there is no evidence to support an essential element of the nonmovant's claim or affirmative defense. *Celotex*, 477 U.S. at 322–25. Once the movant has made this showing, the burden shifts to the nonmovant to establish that there is a genuine issue of material fact so that a reasonable jury might return a verdict in its favor. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986). Moreover, "[c]onclusory allegations, speculation, and unsubstantiated assertions" will not suffice to satisfy the nonmovant's burden. *Douglass v. United Servs. Auto. Ass'n*, 79 F.3d 1415, 1429 (5th Cir. 1996) (en banc). Indeed, factual controversies are resolved in favor of the nonmoving party "'only when an actual controversy exists, that is, when both parties have submitted evidence of contradictory facts.'" *Olabisiomotosho v. City*

*of Hous.*, 185 F.3d 521, 525 (5th Cir. 1999) (quoting *McCallum Highlands, Ltd. v. Washington Capital Dus, Inc.*, 66 F.3d 89, 92 (5th Cir. 1995)).

### III. THE COURT GRANTS SUMMARY JUDGMENT FOR AETNA

Under ERISA, "[i]n determining whether to pay or deny benefits, a plan administrator must make two general types of determinations." *See Schadler v. Anthem Life Ins. Co.*, 147 F.3d 388, 394 (5th Cir. 1998). First, the administrator must ascertain what facts underlie the claim for benefits. *Id.* Then, the administrator must determine "whether those facts constitute a claim to be honored under the terms of the plan." *Id.* (quoting *Pierre v. Conn. Gen. Life Ins. Co./Life Ins. Co. of N. Am.*, 932 F.2d 1552, 1557 (5th Cir.1991)). If the administrator denies benefits and the claimant exhausts his administrative appeals, the claimant may bring a civil action "to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan." 29 U.S.C. § 1132(a)(1)(B).

If a plan administrator has "discretionary authority to determine eligibility for benefits and to construe the terms of the plan," then the court reviews the administrator's decision for an abuse of discretion. *Corry v. Liberty Life Assur. Co. of Boston*, 499 F.3d 389, 397 (5th Cir. 2007) (quoting *Vega v. Nat'l Life Ins. Serv., Inc.*, 188 F.3d 287, 295 (5th Cir. 1999) (en banc)). Under the abuse of discretion standard, the administrator's decision will prevail if it "is supported by substantial evidence and is not arbitrary and capricious." *Ellis v. Liberty Life Assur. Co. of Boston*, 394 F.3d 262, 273 (5th Cir. 2004). "Substantial evidence is more than a scintilla, less than a preponderance, and is such relevant evidence as a reasonable mind

might accept as adequate to support a conclusion." *Id.* (internal quotation marks and citation omitted). "An arbitrary decision," by contrast, "is one made without a rational connection between the known facts and the decision or between the found facts and the evidence." *Corry*, 499 F.3d at 398 (internal quotation marks and citation omitted).

"If the administrator both administers and insures the Plan, such a conflict of interest is weighed as a factor in determining whether there is an abuse of discretion." *Porter v. Lowe's Cos., Inc.'s Bus. Travel Accident Ins. Plan*, 731 F.3d 360, 364 (5th Cir. 2013) (internal quotation marks and citation omitted). The Fifth Circuit has held that "a reviewing court may give more weight to a conflict of interest, where the circumstances surrounding the plan administrator's decision suggest 'procedural unreasonableness.'" *Schexnayder v. Hartford Life and Acc. Ins. Co.*, 600 F.3d 465, 469 (5th Cir. 2010) (quoting *Metro. Life Ins. Co. v. Glenn*, 554 U.S. 105, 118 (2008)).

Davis contends that Aetna abused its discretion in denying her claim for LTD benefits. Davis argues that procedural unreasonableness rendered Dr. Braun and Dr. Ayyar's peer review assessments unreliable, and that substantial evidence did not support Aetna's finding of disability. The Court addresses each of these arguments in turn.

### A. The Reliability of the Peer Review Assessments

ERISA does not require plan administrators to accord special weight to the opinions of a claimant's treating physician, or to explain why they credited conflicting evidence. *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 834 (2003). However, a plan administrator "may not arbitrarily refuse to credit a claimant's reliable evidence . . . ." *Id.*

For example, a plan administrator may abuse its discretion when it ignores or misstates the results of a physician's evaluation of the claimant's functional capacity. *See Alexander v. Hartford Life & Acc. Ins. Co.*, 347 Fed. App'x 123, 125–26 (5th Cir. 2009) (per curiam). An administrator's failure to provide a peer reviewer with all relevant medical records may also support a finding that the administrator abused its discretion. *See Franklin v. AT & T Corp.*, 2010 WL 669762, at *6 (N.D. Tex. 2010).

Davis argues that Dr. Braun and Dr. Ayyar's peer review assessments are unreliable for several reasons. First, Davis claims that Aetna did not provide the physicians with all relevant medical records. In particular, Davis claims that Aetna did not provide Dr. Braun with some of Dr. Cheatum's Attorney Physician Statements or Worksheets, certain lab results, and the IME report. According to Davis, the Attorney Physician Statements, Worksheets, and abnormal lab results supported the severity of Davis's symptoms, and also offered explanations of how Davis's cognitive problems affected her performance at work. Aetna has not offered an adequate explanation for why these records were omitted.

On the other hand, Davis does not explain how the IME report would have impacted Dr. Braun's opinion. Indeed, Dr. Braun's assessment indicates that he was aware of the IME report, and expressly disagreed with its results due to the advent of more recent medical information. *See* App. at 1183–84. Moreover, Davis does not identify any document that Aetna failed to provide Dr. Ayyar, and Dr. Ayyar reached the same conclusion as Dr. Braun. Thus, Aetna's failure to provide Dr. Braun with all relevant medical records weighs in

Davis's favor, but only to the extent that Aetna did not provide Dr. Braun with certain Attorney Physician Statements, Worksheets, and lab results.

Davis next contends that there are several unexplained gaps between Dr. Cheatum's finding of disability and Dr. Braun and Dr. Ayyar's reports. According to Davis, the peer review physicians failed to explain why Davis's symptoms were not disabling or why Dr. Cheatum's documentation of her symptoms was insufficient. Davis argues that these unexplained gaps, like the one in *Bernardo v. American Airlines, Inc.*, 297 Fed. App'x 342 (5th Cir. 2008) (per curiam), should weigh in her favor.

In *Bernardo*, the claimant sought benefits under a LTD plan, citing a disabling blood disorder and neurological side effects from her medication. *Id.* at 343–44. Although the blood disorder went into remission, the claimant continued to suffer severe side effects from the drug. *Id.* at 344. A neurologist and hematologist both evaluated the claimant's neurological symptoms and concluded that she was permanently disabled. *Id.* at 344–45. The claimant's plan administrator then had an oncologist perform a peer review. *Id.* at 345. The oncologist opined that the drug's side effects were not clear or serious and recommended a denial of benefits. *Id.* The Fifth Circuit held that the oncologist's report was "impossible to reconcile" with the neurologist and hematologists' diagnoses because the oncologist "[did] not purport to explain why the severe symptoms found by [the other physicians] were not disabling." *Id.* at 346–47.

Unlike the oncologist in *Bernardo*, the peer review physicians in this case did not dismiss the treating physician's diagnosis wholesale. Both Dr. Braun and Dr . Ayyar agreed

that Davis suffers from systemic lupus erythematosis. The physicians only disagreed with Dr. Cheatum regarding the severity and extent of Davis's symptoms. In reaching this conclusion, both physicians identified numerous deficiencies in Dr. Cheatum's reports and the IME. For example, neither Dr. Cheatum nor Dr. Crane tested Davis for cognitive or memory problems, and neither physician specifically tested each of Davis's discrete functional capabilities, such as her ability to walk, lift, carry, bend, etc. The peer review physicians also explained why they considered the reported limitations exaggerated. For instance, the peer review physicians acknowledged that Davis had tender and swollen joints, but they also noted that Dr. Cheatum's most recent reports indicated that Davis had well-preserved range of motion. Davis contends that Dr. Braun and Dr. Ayyar ignored her consistent complaints of fatigue and pain. Yet Dr. Braun and Dr. Ayyar had additional evidence – the public records search and video surveillance – that contradicted Davis's self-reported symptoms.

There were some minor unexplained gaps between the medical records and Dr. Braun and Dr. Ayyar's opinions. Dr. Braun distorted Dr. Cheatum's notes when he said Davis presented "without active synovitis," when in fact Dr. Cheatum stated Davis's knees, ankles, and feet "d[id] not have a lot of active synovitis." *Compare* App. at 1186, *with id.* at 0879. Dr. Ayyar similarly opined that Davis did not have any "widespread serologic abnormalities," when in fact Davis's lab results exhibited a low blood cell count, low hematocrit count, low hemoglobin count, high neutrophil count, low lymphocyte count, high sedimentation rate, and the presence of antiphospholipid antibodies. *Compare id.* at 1208,

*with id.* at 0861–62, 0864, 0883–84. However, Dr. Cheatum himself acknowledged that Davis's musculoskeletal function was essentially normal and that she was hematologically and hemodynamically stable. *Id.* at 1240. Dr. Ayyar's review of Davis's lab results confirmed that Davis did not suffer from any debilitating muscular or serological deformities. These inconsistencies do not render the peer review reports inherently unreliable.

Lastly, Davis claims that Aetna abused its discretion by not requesting a peer review from a rheumatologist. Under ERISA regulations, plan administrators must utilize peer review professionals who have "appropriate training and experience in the field of medicine involved in the medical judgment." 29 C.F.R. § 2560.503-1(h)(3). Both Dr. Braun and Dr. Ayyar were board certified in occupational medicine. Davis does not explain why these qualifications rendered Dr. Braun and Dr. Ayyar unsuited to the task of determining whether Davis could work in "any reasonable occupation." Aetna did not request review from a specialist in a completely unrelated field of medicine, such as pediatrics or oncology. Aetna's reliance on the medical judgment of occupational physicians was not an abuse of discretion.

### B. Aetna's Evaluation of the Medical Evidence

Davis next attacks the sufficiency of the medical evidence to support Aetna's denial of benefits. Davis contends that Aetna arbitrarily rejected Dr. Cheatum's finding of disability and discounted Davis's personal reports of pain, fatigue, stiffness, and short-term memory loss. Davis argues that Aetna myopically focused on Dr. Braun and Dr. Ayyar's reports and on the results of the public records search and video surveillance. Davis maintains that

*Audino v. Raytheon Co. Short Term Disability Plan*, 129 F. App'x 882 (5th Cir. 2005) (per curiam), controls this case.

In *Audino*, the claimant suffered from rheumatoid arthritis and optic neuritis, with symptoms of extreme fatigue, joint pain, and swelling. *Id.* at 884–85. The plan administrator denied both STD and LTD benefits. The court found several oversights in the administrator's decision, including: (1) ignoring employer comments to the effect that the claimant's medical conditions prevented her from fulfilling the minimum requirements of her job; (2) failing to explain why the subjective and objective evidence was insufficient to establish that the claimant could not meet specific occupational requirements; (3) relying on the opinions of medical consultants who ignored or misstated test results; and (4) discounting the claimant's consistent complaints of pain over the years. *Id.* at *1–3. Accordingly, the court held that the plan administrator had acted arbitrarily and capriciously in denying STD benefits and remanded for a new eligibility determination. *Id.* at *3.

Unlike the plan administrator in *Audino*, Aetna had substantial evidence to support its denial of LTD benefits under the "any reasonable occupation" standard. A review of Aetna's decision letters reveals that Aetna considered all of the relevant medical evidence – including Dr. Cheatum's medical records and opinions, the IME report, Dr. Braun's peer review assessment, the public records search, the video surveillance, the phone interviews with Davis, and finally Dr. Ayyar's three peer review assessments – before denying LTD benefits. Both Dr. Braun and Dr. Ayyar concluded that Davis's symptoms had improved recently and did not require continuous occupational restrictions. As discussed above, any

inconsistencies between these opinions and the opinion of Dr. Cheatum were minor. The public records search and video surveillance also revealed a higher level of activity than either Davis or Dr. Cheatum had reported. Under the abuse of discretion standard, plan administrators need not explain why they credited evidence that contradicts the claimant's reported limitations. *See Black & Decker*, 538 U.S. at 834; *see also Sweatman v. Comm. Union Ins. Co.*, 39 F.3d 594 (5th Cir. 1994) (finding no abuse of discretion where physicians reached different opinions after review of all hospital records).

In rebuttal of Aetna's denial of LTD benefits, Dr. Cheatum explained that lupus patients frequently experience variations in the severity of their symptoms from day to day. Dr. Cheatum argued that the supposed improvements in Davis's medical condition merely reflected her abilities on a "good day." However, Dr. Ayyar's review of Davis's medical records led him to conclude that Davis did not experience such frequent flare-ups of her lupus symptoms that she would be continuously impaired. In addition, Dr. Ayyar noted there was no evidence of widespread physical or serologic deformities that required accommodation. The Court concludes the connection between the medical evidence and Aetna's finding of no disability was rational.

Finally, the Court cannot ignore the Administrative Law Judge's denial of Davis's claim for Social Security Disability Insurance. "Although a Social Security determination of disability is not dispositive of a disability determination under an ERISA plan, it is highly relevant to a determination of whether the claims administrator acted arbitrarily and capriciously." *Franklin*, 2010 WL 669762, at *4 (internal quotation marks and citations

omitted). Here, in denying benefits, the judge found that "[t]he claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not found credible to the extent that they are outside the range of medically reasonable attribution." App. at 0740. The judge's findings corroborate Dr. Braun and Dr. Ayyar's opinions and Aetna's decision regarding Davis's claim for LTD benefits.

### C. Aetna Did Not Abuse Its Discretion in Denying LTD Benefits

The Court determines that Aetna did not abuse its discretion in denying Davis's claim for LTD benefits. Although Aetna had a structural conflict of interest, Davis has not shown that the conflict impacted Aetna's decision to deny benefits in any significant way. There were apparently some minor inconsistencies and omissions in Dr. Braun and Dr. Ayyar's peer review assessments. Overall, however, the reports were reliable. In light of all the physicians' assessments, the medical records, Davis's personal representations, the public records search, and the video surveillance, Aetna had substantial evidence that Davis was not disabled. The denial of social security benefits strongly corroborates Aetna's decision in this regard. Because Aetna's decision is supported by substantial evidence and is not arbitrary or capricious, Aetna did not abuse its discretion in denying LTD benefits.

### CONCLUSION

The Court concludes that Aetna did not abuse its discretion in discontinuing Davis's LTD benefits. Accordingly, the Court awards summary judgment for Aetna.

Signed May 26, 2016.

_____
David C. Godbey
United States District Judge

ORDER – PAGE 17